MISHCON DE REYA NEW YORK LLP
Mark S. Raskin (*admitted Pro Hac Vice*)
Email: mark.raskin@mishcon.com
John F. Petrsoric (*admitted* Pro *Hac Vice*)
Email: john.petrsoric@mishcon.com
Eric P. Berger (*admitted Pro Hac Vice*)
Email: eric.berger@mishcon.com
750 7th Avenue, 26th Floor
New York, New York  10019
Telephone: 212.612.3270
Facsimile: 212.612.3297

RUSS AUGUST & KABAT
Marc A. Fenster, State Bar No. 181067
Email: mfenster@raklaw.com
Irene Y. Lee, State Bar No. 213625
Email: ilee@raklaw.com
12424 Wilshire Boulevard, 12th Floor
Los Angeles, California  90025
Telephone: 310.826.7474
Facsimile:  310.826.6991

Attorneys for Plaintiff
McRO, Inc., d.b.a. Planet Blue

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| McRo, Inc., d.b.a. Planet Blue,<br><br>    Plaintiff,<br><br>    v.<br><br>Namco Bandai Games America, Inc., et al.<br><br>    Defendants. | **CASE No. 12-cv-10322-GW (FFMx)**<br><br>**PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF**<br><br>**Honorable George H. Wu**<br><br><u>Hearing</u>:<br>Date: April 28, 2014<br>Time: 8:30 a.m.<br>Courtroom: 10<br><br>CONSOLIDATED WITH:<br>12-cv-10323-GW (FFMx)<br>12-cv-10326-GW (FFMx)<br>12-cv-10327-GW (FFMx)<br>12-cv-10329-GW (FFMx)<br>12-cv-10331-GW (FFMx)<br>12-cv-10333-GW (FFMx)<br>12-cv-10335-GW (FFMx)<br>12-cv-10336-GW (FFMx)<br>12-cv-10337-GW (FFMx) |

MISHCON DE REYA NEW YORK LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MISHCON DE REYA NEW YORK LLP

1 | Namco Bandai Games America, Inc., et al., | 12-cv-10338-GW (FFMx)
2 | | 12-cv-10340-GW (FFMx)
| | 12-cv-10341-GW (FFMx)
3 | Counterclaim-Plaintiffs, | 12-cv-10342-GW (FFMx)

4 | v.

5 |

6 | McRo, Inc., d.b.a. Planet Blue,

7 | Counterclaim-Defendants.

8 |

9 | McRo, Inc., d.b.a. Planet Blue, | **CASE No. 14-cv-336-GW (FFMx)**

10 | Plaintiff,

11 | | TENTATIVELY CONSOLIDATED
WITH 12-cv-10322-GW (FFMx)

12 | v.

13 | Activision Blizzard, Inc.,

14 | Defendant.

15 |

16 | McRo, Inc., d.b.a. Planet Blue, | **CASE No. 14-cv-352-GW (FFMx)**

17 | Plaintiff,

18 | | TENTATIVELY CONSOLIDATED
WITH 12-cv-10322-GW (FFMx)

19 | v.

20 | Infinity Ward, Inc.,

21 |

22 | Defendant.

23 |

24

25

26

27

28

---

PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF

MISHCON DE REYA NEW YORK LLP

| | |
|---|---|
| McR0, Inc., d.b.a. Planet Blue, | **CASE No. 14-cv-358-GW (FFMx)** |
| Plaintiff, | TENTATIVELY CONSOLIDATED WITH 12-cv-10322-GW (FFMx) |
| v. | |
| LucasArts Entertainment Company LLC, | |
| Defendant. | |
| McRo, Inc., d.b.a. Planet Blue, | **CASE No. 14-cv-417-GW (FFMx)** |
| Plaintiff, | TENTATIVELY CONSOLIDATED WITH 12-cv-10322-GW (FFMx) |
| v. | |
| Warner Bros. Interactive Entertainment, Inc., | |
| Defendant. | |
| McRo, Inc., d.b.a. Planet Blue, | **CASE No. 13-cv-1870-GW (FFMx)** |
| Plaintiff, | TENTATIVELY CONSOLIDATED WITH 12-cv-10322-GW (FFMx) |
| v. | |
| Atlus U.S.A., et al. | |
| Defendant. | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MISHCON DE REYA NEW YORK LLP

| | |
|---|---|
| McRo, Inc., d.b.a. Planet Blue, | **CASE No. 14-cv-383-GW (FFMx)** |
| Plaintiff, | NOT YET CONSOLIDATED |
| v. | |
| Sony Computer Entertainment America LLC et al., | |
| Defendants. | |
| McRo, Inc., d.b.a. Planet Blue, | **CASE No. 14-cv-332-GW (FFMx)** |
| Plaintiff, | NOT YET CONSOLIDATED |
| v. | |
| Sucker Punch Productions LLC, | |
| Defendant. | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................1

II.  PRINCIPLES OF CLAIM CONSTRUCTION.................................1

    A.  The Role of Intrinsic and Extrinsic Evidence ..................1

    B.  Courts Need Not Construe Every Disputed Term.......................4

III.  OVERVIEW OF THE TECHNOLOGY RELATING TO THE
PATENTS-IN-SUIT ..........................................................................5

    A.  History of Facial Animation..............................................5

    B.  The Patented Technology ..................................................7

IV.  PROPOSED CONSTRUCTIONS ...................................................9

    A.  "[A method for] automatically animating lip
synchronization and facial expression of three-dimensional
characters comprising"........................................................9

    B.  "morph weight set[s]"......................................................12

    C.  "an intermediate stream of output morph weight sets"................15

    D.  "lip synchronization and facial expression control"/
"lip and facial expression synchronized"....................................18

    E.  "first set of rules" .........................................................21

CERTIFICATE OF SERVICE ......................................................25

MISHCON DE REYA NEW YORK LLP

PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF

# TABLE OF AUTHORITIES

**Cases**                                                 **Page(s)**

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.*,
   438 F.3d 1374 (Fed. Cir. 2006) ............................................... 17, 20

*Edisync Sys. v. Centra Software, Inc.*,
   No. 03-cv-1587-WYD-MEH, 2012 U.S. Dist. LEXIS 83169
   (D. Colo. June 15, 2012) ........................................................... 4

*EON Corp. IP Holdings, LLC v. Sensus USA Inc.*,
   No. 6:09-CV-116-JDL, 2010 U.S. Dist. LEXIS 83442
   (E.D. Tex. Aug. 11, 2010) ......................................................... 4

*Finjan, Inc. v. Secure Computing Corp.*,
   626 F.3d 1197 (Fed. Cir. 2010) .................................................. 4

*Helmsderfer v. Bobrick Washroom Equip., Inc.*,
   527 F.3d 1379 (Fed. Cir. 2008) ............................................... 2, 12

*High Point Sarl v. Sprint Nextel Corp.*,
   No. 09- 2269-CM-DJW, 2010 U.S. Dist. LEXIS 85497
   (D. Kan. Aug. 18, 2010) ........................................................... 4

*HTC Corp. v. IPCom GmbH & Co.*,
   667 F.3d 1270 (Fed. Cir. 2012) .................................................. 3

*i4i Ltd. P'ship v. Microsoft Corp.*,
   598 F.3d 831 (Fed. Cir. 2010) ................................................... 2

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
   381 F.3d 1111 (Fed. Cir. 2004) .................................................. 3

*Interactive Gift Express, Inc. v. CompuServe Inc.*,
   256 F.3d 1323 (Fed. Cir. 2000) ................................................. 11

*K-2 Corp. v. Salomon S.A.*,
   191 F.3d 1356 (Fed. Cir. 1999) .................................................. 2

*Liebel-Flarsheim Co. v. Medrad Inc.*,
   358 F.3d 898 (Fed. Cir. 2004) ................................................... 17

MISHCON DE REYA NEW YORK LLP

MISHCON DE REYA NEW YORK LLP

*Mirror Worlds, LLC v. Apple, Inc.*,
    No. 6:08-CV-88-LED, 2010 U.S. Dist. LEXIS 82070
    (E.D. Tex. Aug. 11, 2010) ......................................................................... 4, 18

*Nazomi Commc'ns, Inc. v. Arm Holdings, PLC.*,
    403 F.3d 1364 (Fed. Cir. 2005) ........................................................................ 17

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*,
    521 F.3d 1351 (Fed. Cir. 2008) .......................................................................... 4

*Oatey Co. v. IPS Corp.*,
    514 F.3d 1271 (Fed. Cir. 2008) ............................................................... 3, 23, 24

*On-Line Techs., Inc. v. Bodenseewerk Perkin-Elmer GmbH*,
    386 F.3d 1133 (Fed. Cir. 2004) ..................................................... 3, 11, 23, 24

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc) ................................................*passim*

*Power-One, Inc. v. Artesyn Technologies, Inc.*,
    599 F.3d 1343 (Fed. Cir. 2010) (*internal quotation marks omitted*) ........... 18, 19

*Thorner v. Sony Computer Entm't Am. L.L.C.*,
    669 F.3d 1362 (Fed. Cir. 2012) ................................................................*passim*

*U.S. Surgical Corp. v. Ethicon, Inc.*,
    103 F.3d 1554 (Fed. Cir. 1997) ..................................................................... 4, 23

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
    503 F.3d 1295 (Fed. Cir. 2007) .......................................................................... 3

*Versa Corp. v. Ag-Bag Int'l Ltd.*,
    392 F.3d 1325 (Fed. Cir. 2004) ........................................................................ 17

**Other Authorities**

D.I. 200, *December 12, 2013 Joint Status Report* .................................................. 12

## I.   INTRODUCTION

McRo, Inc., d.b.a. Planet Blue ("Planet Blue"), respectfully submits this opening brief on the proper construction of disputed claim terms of U.S. Patent Nos. 6,307,576 ("the '576 Patent") and 6,611,278 ("the '278 Patent") (collectively, the "Patents-in-Suit").  For the convenience of the Court, copies of the '576 Patent and the '278 Patent are attached as Exhibit A and B, respectively. The asserted claims of the '576 Patent are 1, 7-9, and 13.  The asserted claims of the '278 Patent are 1-4, 6, 9, 13, and 15-17.

## II.   PRINCIPLES OF CLAIM CONSTRUCTION

The principles of claim construction are well-settled, and the methodology for applying these principles in construing claim terms is straightforward.  A correct application of the principles of claim construction follows two basic steps: (1) giving a term its ordinary meaning, i.e., its meaning to one skilled in the art after reading the entire patent; and (2) determining whether the patentee diverted from this ordinary meaning by giving a special definition (referred to as "lexicography") for the claim term or by disclaiming a portion of the term's ordinary meaning.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1316-17 (Fed. Cir. 2005) (en banc).  This methodology—prescribed by the Federal Circuit en banc in *Phillips*—is authoritative, and it can be applied consistently to resolve claim construction disputes.

### A. The Role of Intrinsic and Extrinsic Evidence

In *Phillips* and previously in *Vitronics Corp. v. Conceptronic, Inc.*, the Federal Circuit identified a hierarchy of sources for conducting the claim construction analysis.  *Phillips*, 415 F.3d 1303, 1324 (Fed. Cir. 2005) (en banc) ("In Vitronics, this court . . . set forth guidelines for reaching the correct claim construction . . . [t]oday, we adhere to that approach and reaffirm the approach to claim construction outlined in that case . . .."); *Vitronics*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  Specifically, the "intrinsic evidence is the most significant source of

MISHCON DE REYA NEW YORK LLP

1  the legally operative meaning of disputed claim language." *Vitronics*, 90 F.3d at

2  1582.  Indeed, where the intrinsic evidence is unambiguous as to the scope of the

3  patented invention, reliance on extrinsic evidence is improper.  *Id.* at 1583.  The

4  intrinsic evidence includes: the claims themselves; the specification; and the

5  prosecution history.  *Id.* at 1582.

6      The analysis starts with a "look to the words of the claims themselves, both

7  asserted and nonasserted, to define the scope of the patented invention."  *Id.*  Citing

8  to Supreme Court precedent of over a century ago, the *Phillips* court reiterated that

9  the claims are "of primary importance, in the effort to ascertain precisely what it is

10  that is patented."  *Phillips*, 415 F.3d at 1312 (citing *Merrill v. Yeomans*, 94 U.S.

11  568, 570 (1876)).  "[T]he words of a claim 'are generally given their ordinary and

12  customary meaning.'"  *Id.* at 1312 (quoting *Vitronics*, 90 F.3d at 1582).  Attempts

13  to rewrite claims should therefore be rejected.  *See K-2 Corp. v. Salomon S.A.*, 191

14  F.3d 1356, 1364 (Fed. Cir. 1999) ("Courts do not rewrite claims; instead, we give

15  effect to the terms chosen by the patentee."); *see also i4i Ltd. P'ship v. Microsoft

16  Corp.*, 598 F.3d 831, 843 (Fed. Cir. 2010) ("Had the inventors intended this

17  limitation, they could have drafted the claims to expressly include it.").

18      After the claims themselves, "the specification is always highly relevant to

19  the claim construction analysis.  Usually, it is dispositive; it is the single best guide

20  to the meaning of a disputed term."  *Phillips*, 415 F.3d at 1315.  "The specification

21  may reveal a special definition given to a claim term by the patentee that differs

22  from the meaning it would otherwise possess."  *Id.* at 1316.  This is often referred

23  to as the patentee acting as its own lexicographer.  "To act as its own

24  lexicographer, a patentee must clearly set forth a definition of the disputed claim

25  term other than its plain and ordinary meaning."  *Thorner v. Sony Computer Entm't

26  Am. L.L.C.*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (internal quotations omitted).[1]

27

28  _____

[1]  *See also Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1381
(Fed. Cir. 2008) (the inventor's definition controls "when they clearly express an

MISHCON DE REYA NEW YORK LLP

MISHCON DE REYA NEW YORK LLP

1   The only other acceptable way in which claim scope may be limited is if the

2   patentee disavows claim scope by demonstrating "intent to deviate from the

3   ordinary and accustomed meaning of a claim term by including in the specification

4   expressions of manifest exclusion or restriction, representing a clear disavowal of

5   claim scope." *Thorner*, 669 F.3d at 1366-67 (internal quotations omitted) ("We do

6   not read limitations from the specification into claims; we do not redefine words.

7   Only the patentee can do that. To constitute disclaimer, there must be a clear and

8   unmistakable disclaimer.").   Moreover, the Court should not normally "interpret

9   claim terms in a way that excludes embodiments disclosed in the specification."

10  *Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276 (Fed. Cir. 2008).[2]

11      After the specification, the court may consider the prosecution history of the

12  patent.  *Phillips*, 415 F.3d at 1317.  But while the prosecution history can offer

13  insight into the meaning of a particular claim term, the "[c]laim language and the

14  specification generally carry greater weight."  *HTC Corp. v. IPCom GmbH & Co.*,

15  667 F.3d 1270, 1276 (Fed. Cir. 2012).

16      Finally, if the intrinsic sources of meaning are unclear, a court may turn to

17  extrinsic evidence, anything that is external to the patent and file history, e.g.,

18

19  intent" to define a term); *Vitronics*, 90 F.3d at 1582. ("The specification acts as a
    dictionary when it expressly defines terms used in the claims"); *Innova/Pure*

20  *Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1117 (Fed. Cir.

21  2004) ("All that is required is that the patent applicant set out the different meaning
    in the specification in a manner sufficient to give one of ordinary skill in the art

22  notice of the change from ordinary meaning.  Because the inquiry into the meaning

23  of claim terms is an objective one, a patentee who notifies the public that claim
    terms are to be limited beyond their ordinary meaning to one of skill in the art will

24  be bound by that notification, even where it may have been unintended.")

25  [2]  *See also Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1305

26  (Fed. Cir. 2007) (rejecting proposed interpretation that would exclude disclosed
    embodiments); *On-Line Techs., Inc. v. Bodenseewerk Perkin-Elmer GmbH*, 386

27  F.3d 1133, 1138 (Fed. Cir. 2004) ("[A] claim interpretation that excludes a
    preferred embodiment from the scope of the claim is rarely, if ever, correct.")

28  (internal quotations omitted).

3

1   dictionaries and expert testimony. *See Phillips*, 415 F.3d at 1317.   Extrinsic

2   evidence in general is "less reliable than the patent and its prosecution history in

3   determining how to read claim terms," *id.*, at 1318, and "[i]n those cases where the

4   public record unambiguously describes the scope of the patented invention,

5   reliance on any extrinsic evidence is improper." *Vitronics*, 90 F.3d at 1583.

**B. Courts Need Not Construe Every Disputed Term**

6

7        "Claim construction is a matter of resolution of disputed meanings and

8   technical scope, to clarify and when necessary to explain what the patentee covered

9   by the claims, for use in the determination of infringement." *U.S. Surgical Corp.*

10  *v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997).   Furthermore, the claim

11  construction process "is not an obligatory exercise in redundancy." *Id.*   District

12  courts "are not (and should not be) required to construe every limitation present in

13  a patent's asserted claims," *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.,*

14  *Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008), even though "it is the court's duty to

15  resolve" a "fundamental dispute regarding the scope of a claim term." *Id.*   When

16  the "claim language is clear to a lay jury who will understand the term," the Court

17  may properly resolve the dispute by rejecting the unnecessary and unhelpful

18  construction proposed by defendants and holding that the term will have its plain

19  and ordinary meaning. *Mirror Worlds, LLC v. Apple, Inc.*, No. 6:08-CV-88-LED,

20  2010 U.S. Dist. LEXIS 82070, at *20 (E.D. Tex. Aug. 11, 2010).[3]

21

22  [3] *See also Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir.

23  2010) (Affirming district court's rejection of defendants' attempts to "resurrect a
    claim construction that the district court had already rejected, without offering a

24  new definition."); *Edisync Sys. v. Centra Software, Inc.*, No. 03-cv-1587-WYD-
    MEH, 2012 U.S. Dist. LEXIS 83169, at *41 (D. Colo. June 15, 2012) ("[T]he

25  phrase 'given computer file' is comprised of easily understood terms . . .
    Therefore, I find the term requires no additional construction."); *High Point Sarl v.*

26  *Sprint Nextel Corp.*, No. 09- 2269-CM-DJW, 2010 U.S. Dist. LEXIS 85497, at

27  *12-*13 (D. Kan. Aug. 18, 2010) (observing that "not every word requires a
    construction" and the terms requiring construction "will likely be terms that would

28  be unfamiliar or confusing to a jury"); *EON Corp. IP Holdings, LLC v. Sensus*

4

MISHCON DE REYA NEW YORK LLP

III.   **OVERVIEW OF THE TECHNOLOGY RELATING TO THE PATENTS-IN-SUIT**

### A. History of Facial Animation

To animate movement of an object or a character, animators would historically use a manual technique called "keyframing."  In this practice, the animator would draw an initial shape or form (representing the object's starting point or position) and draw another form or shape, depicting the object's final position (i.e., the end point of the object's movement).  Another animator – an "in-betweener" – would then draw a new frame for each step of the movement, from beginning to end.  The illusion of movement – the animation – is created by displaying the collection of drawn frames at a certain speed (or "frame rate").  This traditional approach was also adopted for computer animation.

When using computers, artists found that they could take advantage of software to speed up this process.  The artist would model an initial shape or form (representing the object's starting point or position) and model the object's final position.  But now with the power of computers, they did not have to model all of the intermediate frames.  They set a few key frames at the starting frame and ending frame of a given segment of animation and used computer software to automatically shift the shapes between these keyframes.  This process was called "in-betweening" or "tweening."  The artist could now create an animation without modeling each frame in the movement, substantially diminishing the time required to create an animation.  However, because of the reduced number of key frames created by the artist, the animation could suffer in terms of accuracy, awkwardly transitioning from one key frame to the next.  For simple animations, this could be acceptable.  But the process could result in awkward, jerky movement in more

_USA Inc._, No. 6:09-CV-116-JDL, 2010 U.S. Dist. LEXIS 83442, at *71-72 (E.D. Tex. Aug. 11, 2010) ("The Court also finds the terms do not require construction because their meanings are clear in the context of the claims and will be readily understandable to the jury.").

MISHCON DE REYA NEW YORK LLP

complicated animations, unacceptable where realistic movement was essential (or at least where such jerky movement would ruin the illusion).

The animation of facial movements, in particular lip and mouth movements for speaking characters, was one area in which manually setting a sufficient number of key frames was inefficient and time consuming.  Artists trying to use the key frame method would create as a starting point a reference model of a neutral mouth/face position (usually with a closed mouth).  This model would be comprised of a set of vertices for various locations on parts of the model (lips, etc.).  The artist would then model several other mouth/face positions, which could correspond to a different sound that the character would speak (*see* '576 Patent at 2:16-22) or could contribute to the visual representation of a different sound when blended (morphed) with other models (*see* '576 Patent at 2:23-28).  The sounds, like an "ee" or an "oo," are called "phonemes."  The models (or the blended/morphed contribution of multiple models) would put the mouth/lips in the position for making a particular sound (e.g., circular lips for the "oo" sound).  The models for these mouth/face positions were called "morph targets" and each one would be comprised of a set of vertices indicating the mouth/face position in space.

Using the following technique, sometimes referred to as "morphing," the differences between the vertices in the morph target and the neutral model are calculated.  The models may be "morphed" (or blended) by assigning a value, or "morph weight" that would indicate how strong each particular mouth/face shape should be emphasized at a particular point in the animation.  The artist would set the weights at appropriate values at only a few "important" times in the animation/speech (the key frames).  The computer program would interpolate the weights between these key frames (called "tweening").  The "tweening" of these weights would control the blending of the models over time, resulting in the animation.  (*See* '576 Patent at 2:29-37.)  This key frame approach was (and remains) time consuming, even with a highly skilled animator.  (*Id.*)  And due to

MISHCON DE REYA NEW YORK LLP

1   the number of key frames required to accurately depict lip-synchronized speech,

2   this process can be inaccurate when a low number of key frames is utilized because

3   the mouth and facial movement would be unrealistic and not smooth.  (*Id.*)

4   The typical audience is very familiar with lip and facial movements and

5   would be highly sensitive to imperfections in the animation.  The unrealistic

6   quality produced by a low-key-frame approach would destroy the illusion the artist

7   was attempting to create.  Accurate facial animation is important to maintain the

8   illusion.  So when it came to animating a character's face, artists found that a high

9   rate of carefully set key frames was the only way to achieve an acceptable level of

10   quality.  Early attempts at the automation of the lip-synchronization process called

11   for the application of standard (i.e., one-size-fits-all) key frames at each phoneme

12   time, where each "oo" and each "ah," etc., looks like every other one.  For the

13   reasons discussed above, when combined with the lack of artistic control in this

14   one-size-fits-all approach, these early attempts resulted in animations of low and

15   less-than-acceptable quality.

### B. The Patented Technology

16

17   To address the time-consuming nature of manual animation and overcome

18   the unacceptable deficiencies of the one-size-fits-all key frame approach, Maury

19   Rosenfeld devised a unique automated method and system.  This method/system

20   uses a set of rules to automate the process of lip synchronization and facial

21   expression for animated 3-D characters and produce high-quality animation.  By

22   utilizing a set of rules (*see* Section IV.E, *infra*, for reference to the various rules

23   and combinations that could be applied), the artist has finer control and the process

24   produces more realistic transitions between more appropriate mouth shapes.  The

25   artist could also tailor the rules to take into account different speech patterns,

26   emotions, emphases and other features.

27   The method first requires a timed transcript of the sounds the animated

28   character is supposed to speak (a timed sequence of phonemes, or a "phonetic

MISHCON DE REYA NEW YORK LLP

7

sequence"). The timing of the phonetic sequence is essential to the output generated by the patented method. Also required are models of the neutral mouth/face position for the character and a library of other desired mouth/face positions. Each mouth/face position in the library is represented mathematically as a set of differences from the neutral mouth/face position. (*See* '576 Patent at 1:32-36, 46-49.)

The rules evaluate the phoneme sequence that is input into the process and determine the output by producing a stream of morph weight sets. The sequence of morph weight sets instructs the animation software how to morph/blend models in the library to create the desired animation. (*See* '576 Patent at 4:35-48.)

The method is also able to incorporate additional timed data, such as emotional state data or emotemes such as "surprise," "disgust," "embarrassment," "timid smile" to affect the output sequence of morph weight sets, or create additional streams. (*See* '576 Patent at 3:66-4:3.)

The method works as follows. An artist sets up a reference model of a neutral mouth/face position and a number of other mouth/face positions in the library that can either correspond to individual phonemes (*see* '576 Patent at 2:16-22) or be blended together to correspond to individual phonemes (*see* '576 Patent at 2:23-28). (*See also* '576 Patent at 6:46-51.) The method then takes a sequence of timed phonemes (i.e., speech to be spoken by the animated character) and applies a set of rules to that sequence to create a stream of morph weight sets – a sequence that specifies the blending/morphing of the mouth/face models in the library to produce the facial animation represented by the phoneme sequence. (*See* '576 Patent at 6:51-59.) The set of rules allows for the control of the behavior and movement between the neutral position and the other mouth/face positions based on the sequence of phonemes, the timing of the phonemes, and various other criteria. (*See* '576 Patent at 6:60-67.) The stream of morph weight sets is applied to a character, controlling the facial movements and producing an animated,

MISHCON DE REYA NEW YORK LLP

speaking character.  (*See* '576 Patent at 10:64-11:3.)

By using this automated approach, Mr. Rosenfeld was able to significantly streamline the animation workflow and cut down the time spent creating accurate, commercially acceptable computer facial animation.

## IV.    PROPOSED CONSTRUCTIONS

### A.    "[A method for] automatically animating lip synchronization and facial expression of three-dimensional characters comprising"

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| The preamble of Claim 1 of the '576 Patent and Claim 1 of the '278 Patent are limiting.<br><br>A method for animating lip synchronization and facial expression of three-dimensional characters performed by a computer in response to human user input. | the claimed steps are performed from beginning to end without any human intervention to animate lip synchronization and facial expression of three-dimensional characters |
| Asserted Patents/claims: '576 Patent, claim 1; '278 Patent, claim 1 | |
| **Construction significance**:  Defendants contend that they do not practice this claim limitation because the software tools used to create the games at issue allegedly do not operate "automatically" by performing all of the steps of the claimed methods without human intervention.  Defendants have not indicated which steps of the patented method/patent claims they contend require "human intervention."  Therefore, Plaintiff is unable to determine the significance of Defendants' proposed construction.[4] | |

The parties agree that the preamble is limiting for Claim 1 of both the '576 and the '278 Patents.  The parties disagree as to the preamble's construction.

Defendants wish to construe the preamble so as to import two terms into the claims, first that the "claimed steps are performed from beginning to end" and second, that the steps are performed "without any human intervention."  Defendants' construction would impart a specific order to the method claim and exclude any human input from the claimed method.  Putting aside Defendants' transparent attempt to limit the claim by importing Defendant-created language

---

[4]  Planet Blue includes this and subsequent statements regarding the effect of proposed constructions in response to Judge Wu's repeated instructions, including during the February 13, 2014 case management conference, that this content be included in the claim construction briefs.

MISHCON DE REYA NEW YORK LLP

that appears nowhere in the intrinsic record, Defendants' proposed construction contradicts the specification and would exclude the inventor's preferred embodiment from the claims.

The specification teaches that the claimed method is performed by a computer in response to human user input.  (*See, e.g.*, '576 Patent at 6:46-50 ("In operation and use, ***the user must manually set up*** default correspondence rules between all visual phoneme groups and morph weight sets.  To do this, ***the user preferably specifies*** the morph weight sets which correspond to the model speaking. . . ."); 5:1-3 ("Through the use of such rules ***the user can group*** phonemes together that have a similar visual appearance into visual phonemes that function the same as one another."); and 8:36-38 ("Accordingly, using this example, if the user were to use these rules for the spoken word 'Hello', at least four morph targets and a neutral target would be required. . .").)[5]

Moreover, the Patents-in-Suit make it clear that the user's involvement in practicing the claimed method is not limited to specifying rules.  For example, a user may input time aligned phonetic transcriptions ("TAPTS") as part of the claimed method.  (*See* '576 Patent at 7:31-35 ("Once the rule set up is completed as described, the method of the present invention can take any number and length TAPT's ***as input***, and automatically output the corresponding morph weight set stream as seen in FIGS. 1-3.").)  As part of the claimed method, a user may also input various types of timed data to affect the stream of output morph weight sets.  (*See* '576 Patent Abstract ("The method utilizes a set of rules that determine the

---

[5] *See also* '576 Patent at 2:38-41 ("The present invention overcomes many of the deficiencies of the prior art and obtains its objectives by providing an integrated method ***embodied in computer software for use with a computer*** . . ."); 1:45-48 ("Accordingly, it is the primary object of this invention to provide a method for automatically animating lip synchronization and facial expression of three dimensional characters, which is integrated with ***computer*** means . . ."); 3:16-18 ("The method and apparatuses herein described are operably integrated with ***computer*** software and hardware.").

10

1    systems output comprising a stream or streams of morph weight sets when a

2    sequence of timed phonemes or other timed data is encountered.  Other timed data,

3    such as pitch, amplitude, noise amounts, or emotional state data or emotemes such

4    as 'surprise,' 'disgust,' 'embarrassment,' 'timid smile,' or the like, may be inputted

5    to affect the output stream of morph weight sets.").)  That the claimed method "can

6    take . . . TAPT's as input," and timed data "may be inputted" makes clear the

7    existence of human user input.

8         Consequently, the Defendants' proposed construction, which would

9    seemingly exclude user input, is improper because it contradicts what is expressly

10   and repeatedly taught in the specification.  The specification makes it abundantly

11   clear that: (i) a human user may set up and specify rules (*see* '576 Patent at 6:46-

12   50), (ii) a user may inputs time aligned phonetic transcriptions (*see* '576 Patent at

13   7:31-35), and (iii) a user may input various types of timed data (*see* '576 Patent

14   abstract).  Defendants' proposed construction cannot be reconciled with the

15   teaching of the specification.  *See On-Line Techs.*, 386 F.3d at 1138 (An

16   interpretation that excludes an embodiment "is rarely, if ever, correct.").

17        Defendants also seek to construe the preamble to require that "the claimed

18   steps are performed from beginning to end," implying a specific ordering of the

19   claimed method steps.  Defendants presumably seek to include such an

20   extraneous limitation to later argue that their practice of the claimed method is

21   somehow non-infringing because while they perform the steps of the method,

22   they do so in a different order.  But nothing in the claims or the specification

23   assigns the steps of the claimed method a specific order, or requires that those

24   steps be performed from a Defendant-created, undefined "beginning" to a

25   Defendant-created, undefined "end."  To the contrary, the steps of a method claim

26   need only be performed – not necessarily in the recited order, and not necessarily

27   from a "beginning" to an "end."  *See Interactive Gift Express, Inc. v. CompuServe*

28   *Inc.*, 256 F.3d 1323, 1342-43 (Fed. Cir. 2000) ("Unless the steps of a method

11

actually recite an order, the steps are not ordinarily construed to require one.")

**B.     "morph weight set[s]"**

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| A set of values, one for each delta set that, when applied, transform the neutral model to some desired state<br><br>In the alternative:<br>A set of values, one for each delta set that, when applied, transform the neutral model to some desired state, wherein each delta set is the mathematical representation of the difference between the neutral model and another model | a set of values, one for each delta set, that, when applied, transform the neutral model to some desired state such as speaking the "oo" sound or the "th" sound, where there is one delta set for each morph target comprising the vectors that define the position change for each vertex in the morph target relative to the position of the same vertex in the neutral model |

Asserted Patents/claims: '576 Patent, claim 1; '278 Patent, claims 1, 17

**Construction significance**:  Defendants contend that they do not practice this claim limitation because the software tools used to create the games at issue allegedly do not output or create morph weight set streams.  Defendants have also stated, including in the parties' December 12, 2013 *Joint Status Report* (D.I. 200), that "Defendants believe that, as properly construed, this term will provide clear grounds for summary judgment for noninfringement of many, if not all, games now accused of infringement."  (D.I. 200, at 14.)  Defendants have not explained why this claim limitation is allegedly not met or why the software tools allegedly do not output or create a "morph weight set stream."  Based on Defendants' position that the software tools do not output or create a "morph weight set stream," Plaintiff is unable to determine the significance of Defendants' proposed construction, as it would appear to Plaintiff that Defendants' non-infringement position is not dependent upon the construction of this claim term.

When a patentee establishes his own definition for a claim term, the patentee acts as his own lexicographer and his definition controls.  *See Helmsderfer*, 527 F.3d at 1381.  The parties agree that, in the present instance, Mr. Rosenfeld acted as his own lexicographer in defining "morph weight set." (*See, e.g.*, D.I. 200, *December 12, 2013 Joint Status Report*, p. 14. (referring to the "express definition" of "morph weight set".)

In particular, the specification expressly defines the term "morph weight set:"

> *As used herein*, a "morph weight set" is *a set of values, one for each delta set, that, when applied as described, transform the neutral model to some desired state*, such as speaking the "oo" sound or the "th" sound.

PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF

MISHCON DE REYA NEW YORK LLP

> Preferably, one model is designated as the anchor model,
> which the deltas are computed in reference to.

('576 Patent at 4:39-44 (emphasis added).)[6]  Planet Blue's proposed construction applies the clear and unmistakable language of this passage, namely "a set of values, one for each delta set, that, when applied, transform the neutral model to some desired state."  Planet Blue's construction uses the express language of the specification, omitting only the exemplary portion of the express definition ("when applied as described" and "such as speaking the 'oo' sound or the 'th' sound"), which are redundant to the overall claim language and unnecessary to set the boundaries of claim scope.  Planet Blue's use of the specification's express definition should end the claim construction exercise for this term.

Defendants' construction recognizes that the specification expressly defines "morph weight set."  However, Defendants needlessly add extraneous language, apparently in an attempt to incorporate a construction for the term "delta set," which is not a claim term but merely appears in the specification's definition of "morph weight set."  Assuming for sake of argument that a construction of "delta set" is even required,[7] Defendants' proposal is confusing and incomplete.

The Patents-in-Suit define the term "delta set" as follows:

> The deltas of each vertex on each morph target relative to
> the neutral are computed as a vector from each vertex n
> on the reference to each vertex n on each morph target.

---

[6]  *See also* '576 Patent at 1:63-65: "In producing animation products, a value usually from 0 to 1 is assigned to each delta set by the animator and the value is called the 'morph weight'."

[7]  Planet Blue defers to the Court on the issue of whether further construction is required, although as noted, "delta set" is not recited in the asserted claims and will be well within the jury's province after the complete presentation at trial, which will naturally include testimony from Mr. Rosenfeld, plaintiff's experts and defendants' experts.

13

1

2

These are called the delta sets.  There is one delta set for each morph target.

3

('576 Patent at 1:58-62.)[8]  "Delta sets" are defined in the context of "morph

4

targets."  Thus, in order to understand the term "delta sets," one must also define

5

the term "morph targets."

6

This is precisely why Defendants' proposed construction fails.  Their

7

construction purportedly clarifies the term "delta set" but in doing so deliberately

8

leaves undefined the term "morph target."  Without offering any construction for

9

the term "morph target," Defendants' further inclusion of their definition of "delta

10

set" within the "morph weight set" limitation is unhelpful and incomplete.

11

And yet defining "morph target" is a simple exercise.  As with "morph

12

weight set" and "delta set," the specification provides an express definition of

13

"morph target":

14

The current practice for three dimensional computer generated speech animation is by manual techniques commonly using a "morph target" approach.  In this practice a reference model of a neutral mouth position, and several other mouth positions, each corresponding to a different phoneme or set of phonemes is used.  These models are called "morph targets."

15

16

17

18

19

('576 Patent at 1:45-51.)  Consequently, should the Court find that a construction

20

of the term "morph weight set" requires more than what is recited in column 4,

21

lines 39 to 42 of the specification, the construction should define all of the

22

relevant terms, and include the specification's definitions for both "delta set"  and

23

"morph target."   According to the specification, "delta set" is defined as "the

24

vectors from each vertex on the neutral (reference) model to each vertex on the

25

'morph targets'."  The specification defines "morph targets" as "the models of

26

27

28

_____

[8] *See also* '576 Patent at 4:43-44 ("Preferably, one model i[s] designated as the anchor model, which the deltas are computed in reference to.").

MISHCON DE REYA NEW YORK LLP

14

other mouth positions."  Applying these additional definitions, "morph weight set" becomes:

> A set of values, one for each delta set, that, when applied, transform the neutral model to some desired state, wherein each delta set is the vector from each vertex on the neutral (reference) model to each vertex on a model of another mouth position.

This construction can then be simplified to:

> A set of values, one for each delta set, that, when applied, transform the neutral model to some desired state, wherein each delta set is the mathematical representation of the difference between the neutral model and another model.

### C.    "an intermediate stream of output morph weight sets"

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| No further construction is required | A series of morph weight sets, having morph weight sets only at transition start and end times |
| Asserted Patents/claims: '576 Patent, claim 1 ||
| **Construction significance**:  Defendants contend that they do not practice this claim limitation because the use of software tools to create the games at issue allegedly does not generate morph weight sets at all, and allegedly do not generate transition parameters between morph weight sets.  Defendants have not explained why this claim limitation is allegedly not met or why the software tools allegedly do not generate any "morph weight set."  Based on Defendants' position that the software tools do not generate a morph weight set at all, Plaintiff is unable to determine the significance of Defendants' proposed construction, as it would appear to Plaintiff that Defendants' non-infringement position is not dependent upon the construction of this claim term. ||

The term "an intermediate stream of output morph weight sets" requires no further construction beyond what has already been proposed for "morph weight sets."   The meaning of the words "intermediate," "final," and "output" can easily be understood by a jury, rendering further construction of these terms unnecessary.  Defendants' proposed construction, on the other hand, imports Defendant-created, confusing language ("morph weight sets only at transition start and end times") in a transparent attempt to unreasonably and inappropriately limit the claim.  It is baffling how Defendants can take the plain, ordinary and

MISHCON DE REYA NEW YORK LLP

readily understandable term "intermediate stream" and change it into the proposed phrase "only at transition start and end times," which is not only confusing, but defies the claim's plain language.

As described above, the methods of the Patents-in-Suit automatically animate lip synchronization and facial expressions using morph weight set streams. One of the advantages of these inventions over the prior art is the ability of the artist to control the automated process of lip synchronization. ('576 Patent at 2:64 – 3:3.) In that regard, the '576 Patent provides the output of an intermediate output morph weight set stream prior to the output of a final output morph weight set stream.

Claim 1 of the '576 Patent is directed to this method of lip synchronization. Initially, the first set of rules is applied to sub-sequences of phonemes to generate a morph weight set stream as well as transition start times and end times, or transitionary points. This initial morph weight set stream defines a set of keyframes at the determined transitionary points. ('576 Patent at 8:56 – 9:9.) The initial morph weight set stream may be outputted as an intermediate stream of output morph weight sets, as is the case in the embodiment described by Fig. 1. However, there is nothing in claim 1 or the specification that requires this to be the case. To the contrary, the specification expressly states that "[a] morph weight set may be evaluated at any time by interpolating between these keyframes." ('576 Patent at 7:13-15.) Thus, by interpolating between the keyframes defined by the initial morph weight set stream, a number of morph weight set streams can be generated and outputted as an intermediate stream of output morph weight sets. Such an intermediate stream of output morph weight sets would have values at transition start times and end times *as well as at times in between* the start times and end times.

Defendants' proposed construction, to the extent it can be understood, appears to be an attempt to limit the claim term to the preferred embodiment set

MISHCON DE REYA NEW YORK LLP

16

1    forth in Figure 1.  The Federal Circuit, however, has repeatedly counseled against

2    reading limitations from preferred embodiments into the claims of a patent, absent

3    a clear disavowal of claim scope.  *See, e.g., Thorner*, 669 F.3d at 1366-67; *see*

4    *also Liebel-Flarsheim Co. v. Medrad Inc.*, 358 F.3d 898, 906, (Fed. Cir. 2004)

5    (collecting cases where the court has expressly rejected construing claims within

6    the limitations of a preferred embodiment).  This is especially true here, where (i)

7    the claim is plain on its face and is easily understood, and (ii) additional

8    embodiments set forth in the specification expressly contradict Defendants'

9    proposed construction.

10         Defendants' proposed construction must also be rejected because it imports

11   limitations of an unasserted dependent claim ('576 Patent, claim 10) into

12   independent claim 1.  ('576 Patent at 12:7-11.)  Defendants import the "transition

13   start time" and "transition end time" limitations from claim 10 into the

14   construction of "an intermediate stream of output morph weight sets" apparently

15   to define the term "intermediate."  As an initial matter, such transition start and

16   end time language has no relationship to the plain meaning of the term

17   "intermediate."  Furthermore, the limitations "transition start time" and "transition

18   end time" are explicitly recited in dependent claim 10 as additional limitations to

19   those set forth in independent claim 1.  Importing these limitations into claim 1

20   would improperly narrow it, reducing its scope to one identical to that of

21   dependent claim 10.  Such a construction is in direct contradiction to the long-

22   standing doctrine of claim differentiation, which presumes "that an independent

23   claim should not be construed as requiring a limitation added by a dependent

24   claim."  *Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1380

25   (Fed. Cir. 2006); *see also Nazomi Commc'ns, Inc. v. Arm Holdings, PLC.*, 403

26   F.3d 1364, 1370 (Fed. Cir. 2005).  Claim differentiation further dictates the

27   "presumption that each claim in a patent has a different scope."  *Versa Corp. v.*

28   *Ag-Bag Int'l Ltd.*, 392 F.3d 1325, 1330 (Fed. Cir. 2004) (quoting *Comarck*

MISHCON DE REYA NEW YORK LLP

17

1    *Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998)).

2    Defendants' proposed construction violates both of these principles.

3      Consequently, the term "an intermediate stream of output morph weight

4 sets" requires no further construction.  If the Court deems that any construction is

5 required, the term should be accorded its ordinary meaning.

### D.    "lip synchronization and facial expression control"/"lip and facial expression synchronized"

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| No construction is required | Lip and facial movements matching the final stream of output morph weight sets |

| Asserted Patents/claims: '576 Patent, claim 1; '278 Patent, claim 1 |
|---|

| **Construction significance**:  Defendants contend that they do not practice this claim limitation because the use of software tools to create the games at issue allegedly does not perform the broader steps that include these limitations because those software tools allegedly do not generate morph weight sets at all and because any lip and facial movements that may be generated allegedly do not match Planet Blue's identified output morph weight sets.  Defendants have not explained why this claim limitation is allegedly not met or why the software tools allegedly do not generate any "morph weight set."  Based on Defendants' position that the software tools do not generate a morph weight set at all, Plaintiff is unable to determine the significance of Defendants' proposed construction, as it would appear to Plaintiff that Defendants' non-infringement position is not dependent upon the construction of this claim term. |
|---|

17      Defendants proposed these phrases for construction.  It is Planet Blue's

18 position that the Court need not construe these phrases because they comport with

19 "the widely accepted meaning of commonly understood words."  *See Phillips,*

20 415 F.3d at 1312 (Fed. Cir. 2005); *Mirror Worlds,* 2010 U.S. Dist. LEXIS 82070,

21 at *20.  Terms such as "lip synchronization," "facial expression," "control" and

22 "synchronized" are commonly understood and do not require construction in

23 order to help the jury understand the appropriate meaning and scope of the claims.

24      Defendants fail to offer a construction that would help explain any of these

25 terms to a jury. Instead, Defendants take the opportunity to import irrelevant

26 language, inviting the Court to adopt a construction that will only serve to confuse

27 the jury and that is not supported by the specification.  *Power-One, Inc. v. Artesyn*

28 *Technologies, Inc.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010) ("The terms, as

MISHCON DE REYA NEW YORK LLP

18

1   construed by the court, must ensure that the jury fully understands the court's

2   claim construction rulings and what the patentee covered by the claims.")

3   (*internal quotation marks omitted*).

4        Construing the phrases "lip synchronization and facial expression control"

5   and "lip and facial expression synchronized" in terms of a "stream of output

6   morph weight sets" only injects confusion and uncertainty into phrases that were

7   originally clear and commonly understood.  This is readily apparent when

8   Defendants' proposed construction is inserted into the overall claim:

| '278 Patent Claim 1 Original Language (proposed phrase for construction underlined) | '278 Patent Claim 1 Modified Language (Defendants' proposed construction inserted in place of original phrase) |
|---|---|
| * * * applying said output morph weight set stream to an input sequence of animated characters to generate an output sequence of animated characters with <u>lip and facial expression synchronized</u> to said audio sequence. | * * * applying said output morph weight set stream to an input sequence of animated characters to generate an output sequence of animated characters with <u>lip and facial movements matching the final stream of output morph weight sets</u> to said audio sequence. |

15       The original claim terms are clear and easily understood.  Lip and facial

16  expressions are synchronized to the audio sequence.  Defendants' proposed

17  construction, on the other hand, inserts confusion and uncertainty and raises

18  questions such as: are the lip and facial movements matched to the final stream of

19  output morph weight sets, or is the final stream of output morph weight sets

20  matched to the audio sequence, or both?  What do Defendants intend "matched"

21  to mean?  What if the lip and facial expressions are synchronized but not perfectly

22  matched?

23       Moreover, claim 1 of the '576 Patent recites "lip synchronization and facial

24  expression control," which, like the language of the '278 Patent, is also plain on

25  its face.  It is not helpful to the claim construction process to change this term into

26  "lip and facial movements matching the final stream of output morph weight sets"

27  as proposed by Defendants.  The Court should reject Defendants' improper

28  attempt to inject confusion into the claims.  *Power-One, Inc.*, 599 F.3d 1348.

19

In addition to adding confusion, Defendants' proposed construction inserts limitations that are not supported by the specification or the claims. Claim 1 of the '278 Patent includes language claiming "an output sequence of animated characters with lip and facial expression synchronized to said audio sequence." '278 Patent, claim 1 (emphasis added). But neither the '278 Patent claims nor the specification of the Patents-in-Suit mention a "final stream of output morph weight sets," much less require "animated characters with lip and facial movements matching the final stream of output morph weight sets to said audio sequence." The Patents-in-Suit do not use the terms "match" or "matching" in this or any other context, and it is unclear what would be meant by "lip and facial movements *matching* the final stream of output morph weight sets to said audio sequence," as required by Defendants' proposed construction. Moreover, Defendants' proposed construction should also be rejected because it lacks a proper antecedent basis for "the final stream of output morph weight sets." A final stream of output morph weight sets is never introduced in claim 1 of the '278 Patent (it is first introduced in Defendants' proposed construction), and thus there is no antecedent basis for "the" final stream of output morph weight sets. Put simply, Defendants' proposed construction makes no sense.

Although claim 1 of the '576 Patent does recite "a final stream of output morph weight sets," Defendants' proposed construction for "lip synchronization and facial expression control" inserts limitations that are not supported by the specification or the claim itself. Claim 1 of the '576 Patent requires "lip synchronization and facial expression *control* of said animated characters." It does not require "lip and facial movements *matching* the final stream of output morph weight sets of said animated characters," as Defendants propose. Here again, the specification and claims also do not use the terms "match" or "matching" in this or any other context. Planet Blue fails to understand how the claimed "control" can, or should be, construed as "matching." Defendants'

MISHCON DE REYA NEW YORK LLP

proposal appears to be nothing more than an improper attempt to re-write, limit and confuse what are plain and easily understood claim terms.

### E.   "first set of rules"

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| A group of instructions | A group of logic statements that are embodied in a computer software program and used together |
| Asserted Patents/claims: '576 Patent, claims 1, 13; '278 Patent, claims 1, 2 | |
| **Construction significance**:  Defendants contend that they do not practice this claim limitation because the use of software tools to create the games at issue allegedly do not obtain a "first set of rules" because the software tools allegedly do not have a collection of rules that are organized together and meant to be used together in performing the claimed method.  Defendants have not explained why this claim limitation is allegedly not met or why the software tools allegedly do not have a collection of rules that are organized together and meant to be used together in performing the claimed method.  Based on Defendants' position, Plaintiff is unable to determine the significance of Defendants' proposed construction, as it would appear to Plaintiff that Defendants' non-infringement position is not dependent upon the construction of this claim term. | |

A set of rules is, quite simply, a set of instructions.  The patents use the term "rules" to describe the instructions that will define an output morph weight set stream based on the incoming sequence and timing of phonemes:

> The method preferably comprises a set of rules that determine what the output morph weight set steam will be when any sequence of phonemes and their associated times is encountered.

('576 Patent at 4:36-39; *see also id.*, 11:30-32 ("obtaining a first set of rules that define output morph weight set stream as a function of phoneme sequence and time of said phoneme sequence.")

These "instructions" have two parts: (i) the input criteria (e.g., does this particular instruction apply here?), and (ii) functions that will create the output as a result of the input criteria (e.g., if the instruction applies, then apply it to create an output):

> Preferably, each rule comprises two parts, the rule's criteria and the rule's function. Each sub-sequence of time aligned phonetic transcription (TAPT) or other timed data such as pitch, amplitude, noise amount or the

PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF

MISHCON DE REYA NEW YORK LLP

like, is checked against a rule's criteria to see if that rule is applicable. If so, the rule's function is applied to generate the output. The primary function of the rules is to determined [sic] 1) the appropriate morph weight set correspondence with each TAPT sub-sequence; and 2) the time parameters of the morph weight set transitions between the representation of the prior TAPT sub-sequence or other timed data, and the current one.

('576 Patent at 4:50-61.)

The specification is further replete with examples of how the output (the morph weight set stream) is instructed/defined based on the input (phonemes in the phoneme sequence):

| Exemplary Rules | '576 Patent |
|---|---|
| Manually Configured Correspondence Rules | 7:59 – 8:8; 9:30–35. |
| Timing Rules | 8:9–20; 8:25–35; 10:14–45. |
| Context Rules | 8:21–24; 9:66 – 10:13. |
| Randomness Rules | 9:36–48. |
| Emotional Rules | 10:48–63. |

The specification illustrates numerous rules, used in varying configurations. ('576 Patent, Fig. 1A; 5:9-45; 9:23-26.)  These rules, as clearly understood from the entirety of the specification and the requirements of the asserted claims, define the output of the morph weight set stream from the instructions / rules of the Patents-in-Suit.  These "instructions" specify to the program generating the morph weight set stream how the morph weight set stream should be assembled based on the criteria of the phonetic sequence that is encountered.  There is therefore no need to limit the construction of "rules" beyond the concept of "instructions."

Defendants, however, seek to import numerous limitations to this simple

MISHCON DE REYA NEW YORK LLP

22

MISHCON DE REYA NEW YORK LLP

concept, adding a requirement that "logic statements" are "embodied in a computer software program" and are "used together." While "instructions" and "logic statements" are not fundamentally different definitions,[9] Defendants' attempt to include further limitations is improper. Mr. Rosenfeld did not show an "intent to deviate from the ordinary and accustomed meaning" of "rules" and therefore has not made the clear disavowal of claim scope that would warrant importing these limitations. *See Thorner*, 669 F.3d at 1366. Defendants' additional limitations are, at best, found in unrelated aspects of the specification, and, at worst, directly contradicted by the specification and would exclude the preferred embodiment. The Court should not interpret "rules" in a "way that excludes embodiments disclosed in the specification." *Oatey*, 514 F.3d at 1276; *see also On-Line Techs.*, 386 F.3d at 1138.

More particularly, Defendants' proposed limitation "embodied in a computer software program" appears to have been cherry-picked from column 2 (lines 38-44) and column 8 (lines 52-54). The specification's reference to a computer software program refers generally to the operation of the invention *as a whole*, not to describe the manner in which "rules" are incorporated into the method. The word "rule" does not even appear in these sections of the specification. As discussed above with respect to the preamble of the asserted independent claims, one aspect of the artistic control afforded by the invention is the manual input of the correspondence rules. (*See* '576 Patent, 6:46-48 ("In operation and use, the user must manually set up default correspondence rules between all visual phoneme groups and morph weight sets.").) Defendants'

---

[9] While the substantially similar and basic concepts applicable to "rules," "instructions," and "logic statements" might be completely understood by a lay jury, it would appear that construing "rules" or "instructions" as "logic statements" would be an "exercise in redundancy," *U.S. Surgical Corp.*, 103 F.3d at 1568, and Planet Blue would further urge the Court to find that no construction is necessary. "Rules" (and "instructions") are common, easily understood terms. There is no need to construe commonly understood terms for constructions sake alone.

importation of "embodied in a computer software program" into the claim makes it unclear as to whether, after rules information is input and likely stored in some form of data file, the rules information has taken the form of being "embodied in a computer software program."  If the answer is in the negative (or possibly in the negative), then the Defendants' proposed limitation contradicts the specification and the preferred embodiment and must be rejected.  *See Oatey*, 514 F.3d at 1276; *see also On-Line Techs.*, 386 F.3d at 1138.  In any event, Defendants' proposed construction, importing "embodied in a computer software program" into the claims, is unnecessarily limiting and imparts confusion, especially where the specification makes it clear that user-input is expected.

Similarly, Defendant's proposed limitation of "used together" must be rejected.  Defendants appear to have created this phrase from whole cloth and then imported it into the claim in an attempt to avoid infringement.  The phrase "used together" is not found in the intrinsic record and Planet Blue can discern no credible reason for its inclusion in the construction of the term "rules."  Nothing in the claims or specification indicates that the recited "first set of rules" must necessarily be "used together" (whatever the Defendants intend "used together" to mean).  A "first set of rules" is plain on its face and self-explanatory.  Defendants' attempt to import the phrase "used together" (and "embodied in a computer software program") into this claim term is unhelpful and confuses the otherwise plain claim language.

Dated:  February 18, 2014

Respectfully submitted,

MISHCON DE REYA NEW YORK LLP

By:  /s/ Mark S. Raskin
    Mark S. Raskin
    John F. Petrsoric
    Eric P. Berger

RUSS AUGUST & KABAT
   Marc A. Fenster
   Irene Y. Lee

Attorneys for Plaintiff
McRo, Inc., d.b.a. Planet Blue

## CERTIFICATE OF SERVICE

I hereby certify that on February 18, 2014, the foregoing document was filed electronically via the Court's Electronic Case Filing System (ECF).  Notice of the filing is being served upon all counsel of record automatically through Notice of Electronic Filing.

        /s/ Mark S. Raskin
         Mark S. Raskin

MISHCON DE REYA NEW YORK LLP

25